UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PAUL A. GARGANO, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> RONALD ZIMMER, ZELITA ZIMMER, ) <br> and ZIMMER & ASSOCIATES, ) <br> ) <br> Defendants. ) | Civil Action No. 03-12605-NG |

## SECOND AFFIDAVIT OF RONALD ZIMMER

Ronald Zimmer, on oath, deposes and says as follows:

1. I submit this affidavit in further support of Defendants' Motion to Dismiss, and to respond to certain allegations made by the plaintiff in his Opposition to that motion.

2. This affidavit does not challenge all of Mr. Gargano's false allegations, since a majority of them have nothing to do with personal jurisdiction. Therefore, for the sake of brevity, this affidavit only addresses a fraction of the false allegations. The fact that certain allegations are not addressed in no way signifies that I agree with Mr. Gargano's version of events. I do not.

3. Contrary to what Mr. Gargano alleges, my wife, Celita Zimmer, is not nor has she ever been a US citizen. She does not have a US passport. In addition, our four children have always lived and attended school in the Cayman Islands, except during a 10-month period over six years ago while I was in Florida furthering my education in preparation for full-time ministry.

4. My Gargano's statement that we "divide our time" between Cayman, Florida and Pennsylvania is ridiculous. I am a full time pastor of a local church in the Cayman Islands. I

have no associate or assistant. My duties at the church take precedence over anything else. By the nature of the construction business, we do have to do purchasing and exporting from Florida. But we no longer have a home in Florida, and Celita no longer has any US driving license. We certainly do not regularly conduct business at our vacation home in Pennsylvania.

5.  Mr. Gargano's allegation that I pursued or solicited his business is completely false. Mr. Gargano actually first raised with me the possibility of building a new home about 10 years ago. I recall that when we drove down the road from his existing house to Block 33M Parcels 9 and 10, which were two of his beach lots on Cayman Kai, Grand Cayman, Cayman Islands, British West Indies.

6.  At that time, I was working for another company known as Island Pride Construction. Mr. Gargano was a close friend of a client of ours, David Gilmore, for whom we had recently completed a house. I remember Mr. Gargano telling me: "Someday I want you to build Sheila and me a house, perhaps we will build on one of these two lots. We own both of them and I want you to give me your ideas."

7.  I saw Mr. Gargano from time to time after that and he always persisted in bringing up the subject of building him a new house. Around 1995-96, when we were building a house for Archduke Orsini Rosenberg of Austria, another mutual friend, Mr. Gargano became much more insistent that he was going to use us to construct his home because he had heard so many good things from the Rosenbergs and other neighbors.

8.  After then, I do not recall seeing Mr. Gargano for a long time, until a chance meeting in the Miami airport ticket line in early 2001. Mr. Gargano told me that he had sold his two beach lots but was planning on tearing down his existing home and rebuilding a new one. He asked if I was interested, but I informed him that I was not in building anymore and that I

was pastoring a church full time. Mr. Gargano replied: "Perhaps I can persuade you to build just one more house. Let's exchange phone numbers."

9. When I reached home in the Cayman Islands, I told my wife Celita about the chance meeting with the Garganos in the Miami airport. We agreed to, and subsequently did, meet with the Garganos personally at our home in Franksound, Grand Cayman, where the Garganos talked further about building their new home in Cayman Kai.

10. All talks concerning the design of the house (and, later, negotiations) took place on the seaside porch of the Gargano's existing home in Grand Cayman. I remember Mr. Gargano describing to Sheila and me some of the lavish features that he envisioned for the home. He and Sheila paced up and down in their existing home measuring off the room sizes by counting the tiles on the floor, and debated what the size of the new house should be. Mr. Gargano said he was a frustrated architect and he loved to design homes. He said if he had not become a lawyer, he would have loved to have been an architect but he had one problem: he could not draw a straight line. We all broke into laughter.

11. From our conversations, I learned that Mr. Gargano was a discerning and capable designer and had experience building and/or renovating homes in Cambridge, Hyannisport, Nantucket and Killington, Vermont. For example, I remember him saying that he wanted a rotunda dome in the Cayman Kai house with a widow's walk similar to his Cape Cod home, and being insistent that we incorporate some of the roof line and eave details that he had used in his Killington home.

12. Eventually, during the week of their departure from Cayman in April of 2002, Mr. Gargano called me several times to push me to reach a final agreement before he left for Boston. As usual, we met on the seaside porch of their existing house, where we always met to talk about

3

the proposed new house. On that final day before their departure, I handed Mr. Gargano the final draft of the contract. The contract was typed on the letterhead of our newly-formed company (Zimmer & Associates Ltd.) and was signed by the director and sole shareholder, Celita Zimmer.

13. Mr. Gargano accepted the contract and we shook hands in agreement. Mr. Gargano told me: "Good, before I leave the island I will give you back a copy." Subsequently, however, we learned that Mr. Gargano had returned to Massachusetts with the contract. We asked him to please return the original signed contract. He never did. He claimed to have sent it, but we never received it. Instead, we later received a FedEx containing a copy of the original with a "post-it" note saying that the original was sent by first class mail (again, we never received it). Mr. Gargano dated his signature as April 22.

14. At some point later, Mr. Gargano called from Massachusetts to say: "Home Depot Expo has just opened a new store here and they are running a promotion. I can get 10% off everything I buy for the house and then have a year before I have to pay for it." He further said, "I am going to buy everything for the house, Expo will put it into the container and I will ship it to you. All you have to do, Ron, is open the container when it reaches Cayman and put it in the house."

15. I was reluctant about Mr. Gargano's plan, because I knew that losing control of the supply of materials would negatively affect the schedule of the job. Moreover, as I told Mr. Gargano, I never use suppliers outside of Florida and never have had suppliers in Massachusetts. Mr. Gargano never suggested that I come to meet with the suppliers at Home Depot Expo, and I never agreed to do so. I never agreed to do, consented to do, or did anything in Massachusetts whatsoever. I certainly never agreed that I would come to Massachusetts to meet with the Garganos or anyone else.

16. Mr. Gargano and his wife began the exercise of choosing their own materials in Boston. I had nothing to do with this, and had little or no contact with the Garganos at all. After several months, however, Mr. Gargano changed his mind, saying: "You know what, I am not the contractor and I don't want to be the contractor. I am not going to supply all these stuff, you're gonna have to do it." (Mr. Gargano, however, insisted on keeping the appliances as his own responsibility. This would later cause us trouble because of changes in the appliance selection and a back ordered cooktop and hood which delayed our electrical inspection.) Only after Mr. Gargano forced us to take back the supplying of the internal materials did we begin to have more e-mail correspondence in trying to iron out their specifications.

17. Contrary to what Mr. Gargano now claims, he was frequently late in making his scheduled payments. In particular, one payment was so late that Mr. Gargano actually had to send two payments at one time to bring things up to date. Ironically, in his affidavit, Mr. Gargano tried to take credit for this double payment as an act of goodwill. The fact is, according to our records, Mr. Gargano still owes Zimmer & Associates Ltd. over US$40,000.

18. As the house neared completion, I told Mr. Gargano's decorator, Diana Henderson, that we would be leaving the island around the 21st of December to spend Christmas with our family in Pennsylvania. A few days later Diana advised me that she had notified Mr. Gargano's office that I and my family would be leaving the island on the 21st for the Christmas holidays. Knowing that the house was finished, my family and I departed as scheduled.

Signed under the pains and penalties of perjury this 15th day of July, 2004.

_____
Ronald Zimmer

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail/hand/facsimile on:
7/16/04

5